487 So.2d 505 (1986)
Danny Gene HEFNER, Plaintiff-Appellee,
v.
B.J. McADAMS, INC., et al., Defendants-Appellants.
No. 85-67.
Court of Appeal of Louisiana, Third Circuit.
April 9, 1986.
Rehearing Denied May 6, 1986.
*506 Stafford, Stewart & Potter, Russell L. Potter, Alexandria, for defendants-appellants.
Paul J. Guilliot, Lafayette, for plaintiffappellee.
Elizabeth E. Foote, Alexandria, for defendant-appellee.
Before GUIDRY, FORET and HOOD,[1] JJ.
GUIDRY, Judge.
Plaintiff, Danny Gene Hefner, brought this suit seeking to recover damages for injuries allegedly suffered when a car driven by him was rear-ended by an eighteen wheel tractor trailer. Plaintiff brought suit against the driver of the eighteen wheeler, Michael Bixler, the owner of the truck, B.J. McAdams, Inc. (McAdams), and McAdams' insurer, Lloyds of London (Lloyds). Hannalore Hefner, presumably the owner of the automobile driven by plaintiff, made a claim for damages to the Hefner automobile upon Royal Insurance Company, her insurer. Royal paid this claim less the collision deductible. Thereafter, Royal and Hannalore Hefner filed a separate suit against McAdams and Bixler praying for judgment in favor of Royal for the sum of $2,929.00 and for judgment in favor of Hefner in the sum of $100.00. The suits were consolidated for trial. On the day of trial the parties to the suit filed by Royal Insurance Company stipulated that, in the event of a finding of liability on the part of defendants, Royal would be entitled to recover the sum of $2,929.00, subject to reduction by the percentage of any negligence which might be found on *507 the part of Danny Gene Hefner. The claim of Hannalore Hefner for the $100.00 collision deductible is not mentioned in the stipulation. The cases were tried to a jury which rendered a verdict in favor of Danny Gene Hefner against Bixler, McAdams and Lloyds, in solido, awarding special damages in the sum of $2,448.37 and general damages in the sum of $195,000.00. Pursuant to this jury verdict and the stipulation of the parties in the companion suit, a consolidated judgment was rendered and signed by the trial court on August 3, 1984 awarding judgment in favor of Danny Gene Hefner against Bixler, McAdams and Lloyds, in solido, for the total sum of $197,448.37 and in favor of Royal Insurance Company against the same three defendants, in solido, for the sum of $2,929.00.[2] No mention is made in the jury verdict or the formal judgment rendered and signed pursuant thereto of the claim of Hannalore Hefner for the $100.00 collision deductible. Following the rendition and signing of the judgment, Danny Gene Hefner executed a written document granting a full and complete release to Lloyds in consideration of Lloyds' payment to him of the sum of $140,000.00 in full payment and satisfaction of the principal and interest owed by Lloyds on the final judgment, with Lloyds further agreeing to satisfy all court costs resulting from the aforesaid judgment. In this written release, Hefner specifically reserved all rights to recover from Bixler and McAdams, under authority of the aforesaid judgment, the sum of $50,000.00 representing the amount of the liability deductible under the policy issued by Lloyds to McAdams. This written release and satisfaction of judgment is made part of the record.
Defendant, McAdams, then filed motions for a new trial, judgment notwithstanding the verdict, or, in the alternative, a remittitur. These motions were denied. Defendant, McAdams, appealed devolutively. Neither Bixler nor Lloyds appealed and the aforesaid judgment is now final as to these defendants. The plaintiffs neither appealed nor do they answer McAdams' appeal.
These matters remain consolidated on appeal and we will render a separate judgment in the companion case of Royal Insurance Company et al. v. B.J. McAdams, Inc., et al., 487 So.2d 512. In connection with the latter case, we note that appellant does not question the correctness of the jury's determination that the damages suffered by Royal Insurance Company were caused solely by the negligence of the defendants. Therefore, the judgment in that case will be affirmed.[3]
Although appellant sets forth several specifications of trial court error, in essence, appellant urges only that the trial court's award of general damages is excessive.

FACTS
On Monday, December 14, 1981, at 5:00 p.m., Hefner finished his daily work routine for Royal Insurance Company as a claims adjuster. After work he drove to the Casablanca Club where his wife worked as the manager. From 7-10 p.m. Hefner watched Monday night football and consumed three or four bottles of beer. Around 10:00 p.m. Hefner's wife left the club to go home to check on their children. Hefner stayed at the club from 10:00 p.m. to 12:15 a.m. in order to close. After leaving for home, he realized that his cigarettes were almost gone so he proceeded past his subdivision to the stores in downtown Woodworth in order to buy some. After finding all the *508 stores closed in Woodworth, he headed in the direction of his home.
Near the unlit intersection of U.S. Highway 165 and Brookwood Road, just outside of Woodworth, plaintiff slowed down in preparation to make a left hand turn. According to plaintiff, he was traveling approximately 15 mph, he applied his brakes, and he turned on his left blinker lights to indicate his intention to turn left onto Brookwood Road.
Hefner testified that before he began his left hand turn his car was struck in the rear by the eighteen wheeler driven by Bixler. The force of this collision hurled Hefner's car another 100 feet or so into a ditch on the side of the highway. According to Hefner, he must have become unconscious from the collision because he did not remember anything from the point of impact until he found Bixler trying to shake him back into consciousness.
The police and an ambulance soon arrived on the scene. The trooper testified that plaintiff complained to him about stiffness, soreness and pain in his left shoulder. The ambulance team did not transport Hefner to a hospital, but they did apparently perform some first aid at the scene since plaintiff's wife found him with a sling supporting his left arm when she arrived.
According to Mrs. Hefner, when she arrived at the accident location, shortly after the police and ambulance team, she found plaintiff shaking and "snow-white". Mrs. Hefner then told the police officer that she was going to transport plaintiff to the nearest hospital. Apparently Mr. and Mrs. Hefner then drove to the Cabrini Hospital parking lot but never entered the hospital because they did not have their insurance identification cards. According to plaintiff and his wife, they had been refused entrance on one other occasion due to the lack of insurance identification. Instead of obtaining the required identification, they went out for a cup of coffee and then returned to their home.
Appellant first contends that the trial court erred in not granting the motion for new trial, judgment notwithstanding the verdict, or remittitur. Appellant argues that the trial court, in its written reasons for the denial, admitted that the quantum award was not supported by the law and evidence. The trial court's written reasons stated, in pertinent part:
"After reviewing the record in these proceedings, including briefs and memoranda submitted by counsel, and reflecting upon the evidence adduced at the trial, the Court is of the opinion that, while the jury verdict exceeded in quantum that which would have been forthcoming from a bench trial, the defendants in this case specifically asked for a jury trial for reasons perhaps best known to them. It seems fundamentally unfair to afford one side an opportunity to have two bites at the apple."
LSA-C.C.P. art. 1972 states, in part:
"A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence."
When the trial court evidences a strong belief that the judgment is contrary to the law and evidence, it should grant a new trial. Riddle v. Menard, 355 So.2d 1350 (La.App. 3rd Cir. 1978), writ denied, 359 So.2d 627 (La.1978).
In Riddle, the trial judge expressed his opinion that the jury verdict was unjust, and that the jury did not render impartial justice. We do not feel, after reviewing the trial judge's written reasons in this case, that he was of the opinion that the jury verdict was clearly contrary to the law and evidence. The judge only indicated that he would have given a lower quantum award. He did not express the opinion that the award made by the jury abused the great discretion given to juries when making quantum determinations. We therefore do not see any need to remand this case for a new trial. However, since we have the complete record before us, we will determine whether the jury award was excessive. Riddle, supra.
*509 In regard to the sub-issue of whether the trial court erred in denying a judgment notwithstanding the verdict, the appellant has failed to provide any briefing on this issue. Issues not briefed are deemed abandoned. Uniform RulesCourts of Appeal, Rule 2-12.4.
Appellant next argues that the general damage award of $195,000.00 is excessive and completely out of line with awards made in other similar cases. In this connection, appellant argues that plaintiff's injuries were temporary in duration, minor in severity, and, in some instances, not related to the accident.
Before an appellate court can alter a quantum award, the record must clearly show that the trier of fact abused its great discretion. An award may not be altered unless it is unsupported by the record. The question to be answered on the appellate level is whether the trier of fact's award can be reasonably supported by the record, not whether a different award may have been more appropriate. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976); Bitoun v. Landry, 302 So.2d 278 (La.1974).
In reviewing an award of damages to determine whether it is inadequate or excessive, the appellate court must look at the individual circumstances of the case before it. Only after a close analysis of the facts reveals a clear abuse of discretion may the award be altered. Reck v. Stevens, 373 So.2d 498 (La.1979); Broussard v. Peltier, 479 So.2d 679 (La.App. 3rd Cir. 1985).
Moreover, the appellate court is limited to raising inadequate awards to the lowest amount that could have reasonably been awarded, and lowering excessive awards to the highest amount that could have reasonably been awarded. Reck, supra; Coco, supra; Alexander v. Leger, 423 So.2d 731 (La.App. 3rd Cir. 1982), writ denied, 430 So.2d 75 (La.1983).
The proper procedure for testing whether the trier of fact abused its discretion in granting an excessive award is to determine whether the award can be supported under an interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trier of fact. Schexnayder v. Carpenter, 346 So.2d 196 (La.1977).
After the accident Hefner went to see three different doctors concerning physical and emotional complaints which he attributed directly to the accident. Two of the doctors, Dr. Banks and Dr. Holliday, are orthopedic surgeons. The third doctor, Dr. Texada, is a psychiatrist.
Hefner first went to see Dr. Banks on the afternoon of the accident. Hefner had complaints about pain around the left side of his chest, pain in his left shoulder, soreness in his neck, soreness in the occipital region of his head, and some injury to the area around the left eye. The doctor, upon examining Hefner, noted some tenderness around the C-6 level, however, Hefner had full range of motion in his neck. The doctor also discovered some pain in plaintiff's left shoulder, but indicated that the pain was not too severe on this first visit.
Hefner saw Dr. Banks at least four times over the next two years. During these visits, plaintiff still complained about pain in the neck and left shoulder area. Dr. Banks found that plaintiff had a calcium deposit in his left shoulder but did not think that this was causing the shoulder pain because he could not elicit pain when pressing on the shoulder and the deposit had been there for a long time before the accident without any complaint by plaintiff. In his deposition, Dr. Banks indicated that the shoulder pain was due to the cervical injury which plaintiff received during the accident. The doctor explained that injury to the neck probably damaged nerves that extended down to the left shoulder, thus, the medical problem was in the neck area not in the shoulder. To help alleviate the neck pain, Dr. Banks prescribed the use of a head halter traction device which could be used at home. Dr. Banks recommended that plaintiff use the device four times a day for 30 minute periods. Plaintiff admitted that he did not use the device as recommended *510 because it would have interfered with his job as a claims adjuster.
When Dr. Banks was asked for his prognosis he said:
"Oh, I don't know how long he will have trouble, being as he had trouble for this period of time. I would think that he would be apt to be subjected to some discomfort from time to time, depending on the type of activity, and it may last for an indeterminate period of time ... Once you have a neck injury that lasts this long with referred pain to an extremity, it is not unusual for this individual to be a candidate for recurrent problems from time to time. I strongly recommend to all these people that they never give their head halter traction away or let anybody borrow it because they are very apt maybe once or twice, or maybe more or less, [to] need it for a week or so to quiet this thing down."
The doctor further related that plaintiff would be limited in "working overhead or lifting overhead with the neck in the extended position ... Otherwise they have very little discomfort usually, most of the time". The doctor did not think that this would prevent plaintiff from performing his duties as an insurance claims adjuster.
Dr. Bank's finally observed that the shoulder pain had improved or lessened over time and that plaintiff would be able to resume playing golf, his favorite pastime. The doctor concluded his deposition testimony by stating that he did not find any atrophy in plaintiff's left arm or shoulder, and that his condition did not appear to be progressive.
Plaintiff saw the second orthopedic surgeon, Dr. Holliday, for the first time on March 7, 1983, almost one and one-half years after the accident. Dr. Holliday thought that plaintiff's shoulder pain was directly related to the calcium deposit in his left shoulder. He found some tenderness on the posterior part of the shoulder and some atrophy of the shoulder and bicep muscles. The doctor concluded that plaintiff more likely than not had some complications from the calcium deposit before the accident because of the size of the deposit, even though plaintiff told him that he never experienced shoulder pains before the collision. Dr. Holliday opined further that, even if the accident had not happened, plaintiff would have been to see a doctor about his shoulder because the deposit was large enough to cause inflamation by itself. Dr. Holliday ultimately concluded that the trauma from the wreck probably caused some aggravation to plaintiff's shoulder, however, this aggravation should have resolved itself within a couple of months. He admitted that it was possible to have a calcium deposit without any pain, however, he felt that in this case any continuing pain was due to the deposit, not from the trauma to the shoulder.
During his initial visit with the psychiatrist, Dr. Texada, plaintiff complained that since the accident he had experienced a fear of large trucks on the highway, had been having sleeping difficulties, and had some weight loss. Dr. Texada noted anxiety and depression so he prescribed some anti-depressant drugs, which plaintiff tended not to take.
Dr. Texada was of the opinion that plaintiff's phobia of 18 wheelers approaching him from the rear was real. In his deposition, he stated, "There is a realness to the discomfort ... It's very real even though it may primarily be emotional or psychological in character ...". Plaintiff explained to the doctor that when an 18 wheeler approached him from the rear he would start to feel extremely anxious, often he would go beyond the speed limit just to put some distance between himself and the truck. During other confrontations, he was forced to pull off the road to let the truck pass because he found himself shaking uncontrollably and fearful that he would lose all control of the vehicle he was driving.
Plaintiff also related to Dr. Texada that soon after the accident he started having marital and drinking problems. However, the doctor was of the opinion that plaintiff's marriage was unstable before the accident. The doctor further believed that *511 the drinking problems, although they apparently began after the accident, were not caused by the accident and that the drinking could have been one of the factors leading plaintiff to be anxious about driving and anxious about his job performance with Royal Insurance. The doctor stated that alcohol in excessive amounts will increase a person's anxieties after a sobering-up period, and will also induce tremulousness and chemical disturbances in the body that are associated with anxiety.
Dr. Texada was also of the opinion that golf had been a major outlet for plaintiff before the accident. According to the doctor, the reduction of his golfing activities to one time a month, caused by the pain plaintiff experienced in his left shoulder and neck, was a factor in causing plaintiff's depression.
Overall, Dr. Texada was of the opinion that the anxiety plaintiff was experiencing was not a major debilitating disorder. However, he also opined that the accident was a significant reason for plaintiff's problems, but there were other underlying causes. The doctor additionally noted that even though plaintiff said he worried constantly about driving he was still able to drive a motor home from Shreveport to Florida. At their last meeting the doctor noted improvement in plaintiff's emotional and psychological condition. Dr. Texada attributed this to the fact that plaintiff had changed to a job that did not require highway driving, to marital improvements, and to the simple lapse of time.
Considered in a light most favorable to plaintiff, the lay testimony, including that of plaintiff and his wife, can be summarized as follows.
After the accident plaintiff experienced pain and discomfort in his neck and shoulder as well as emotional problems. Because of the pain in his neck and shoulder, plaintiff was unable, for some time, to play golf, his favorite pastime. In addition, because of the pain he experienced and his emotional problems, which were exacerbated by his inability to play golf, plaintiff exhibited a decreased ability to handle his job which required extensive highway travel. Eventually, plaintiff felt it was necessary to resign his position with Royal because of his inability to cope with the job's travel requirements however, shortly thereafter he secured a new position as claims manager with another insurance company in Shreveport. In addition, following the accident, plaintiff began having marital and drinking problems which he attributed to the injuries received by him in the accident, although at the time of trial plaintiff and his wife were reunited, having resolved their marital discord, and he was again drinking in moderation.
Finally, the record reflects that plaintiff was never hospitalized, missed only a few days of work, and required no extensive medical care but only conservative treatment in the form of anelgesics, home halter traction and mild anti-depressant drugs.
Our careful review of the record in this case, in light of the principles set forth at the outset of this opinion, convinces us that the award to plaintiff of $195,000.00 as general damages is excessive and constitutes a clear abuse of the great discretion accorded the trier of fact. Plaintiff received no serious bodily injury as a result of the accident; was not hospitalized; suffered no economic loss other than moderate medical expenses and damage to his car; and, is not shown to have endured any extreme pain or suffering. Although plaintiff did suffer related psychological problems following the accident, plaintiff's marital problems and his alleged excessive consumption of alcohol were not attributed by his own treating physician to the accident. Additionally, all of plaintiff's problems were significantly lessened or completely abated by the time of trial.
Since we determine that the trier of fact clearly abused its discretion in formulating the general damage award in this case, we must reduce same to the highest amount that could have been reasonably awarded. Reck, supra; Coco, supra. Our careful analysis of the record in this case compels the conclusion that the highest amount of general damages awardable to *512 plaintiff in this case is the sum of $60,000.00. We will therefore reduce the total award to plaintiff from $197,448.37 to the sum of $62,448.37.
Appellant finally contends in brief, and we quote, "Since it is clear from the foregoing that the plaintiff has already received $140,000 then once the judgment is reduced, as it properly should be, below the figure of $140,000 then the plaintiff should be deemed to have been paid in full and not entitled to any further sum". What effect the prior payment of $140,000.00 by Lloyds to plaintiff and the release by plaintiff of Lloyds will ultimately have as between plaintiff and McAdams, insofar as the final judgment in this case is concerned, is not an issue before us on this appeal.
For the above and foregoing reasons, the judgment of the trial court is amended so as to reduce the total award in favor of plaintiff, Danny Gene Hefner, and against B.J. McAdams, Inc., from the sum of $197,448.37 to the sum of $62,448.37. In all other respects, the judgment appealed from is affirmed. Costs of this appeal are to be borne one-half (½) by appellant and onehalf (½) by appellee.
AFFIRMED AS AMENDED.
NOTES
[1] Judge Warren Hood of the 14th Judicial District Court participated in this decision as Judge Pro Tempore of the Third Circuit Court of Appeal.
[2] Although Lloyds was cast in solido with Bixler and McAdams for the amount of the judgment rendered in favor of Royal, we observe that Lloyds was never made a party to that suit. For reasons fully set forth in the body of this opinion, Lloyds did not appeal from the judgment. We therefore do not consider that the correctness of the Royal judgment, insofar as it casts Lloyds, is before us.
[3] We do not consider that the issue of the entitlement of Hannalore Hefner to judgment for the collision deductible of $100.00 against McAdams and Bixler is before us on this appeal. The claim of Hannalore Hefner for the $100.00 collision deductible is not mentioned in the trial stipulation or the judgment rendered pursuant thereto.